**This order is SIGNED.**


**Dated: April 16, 2020**



**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Bankruptcy No. 10-26708 |
| Troy R. Morgan, | Chapter 7 |
| Debtor. | Honorable William T. Thurman |

## MEMORANDUM DECISION

This matter came before the Court by way of two separate motions that are interrelated: 1) Troy Morgan's ("Troy") motion to reopen his bankruptcy case and for contempt and sanctions for alleged violation of his discharge injunction and 2) Brent Morgan's ("Brent") motion to dismiss Troy's bankruptcy case – Brent's motion is better characterized as a motion to reclose the case. Both motions present identical issues and arguments; therefore, the Court combined these motions to be heard at one joint evidentiary hearing. The Court does not customarily refer to parties by their first names, but here, since their surnames are identical, the Court elects to use first names. To briefly summarize, the primary issues are whether this case should be reclosed, whether any obligation Troy had to Brent was discharged, whether Brent knew about the bankruptcy, and if so, should Brent be sanctioned for violating the discharge. The Court conducted an evidentiary hearing on February 10, 2020, and heard closing oral argument on March 9, 2020. Blake Miller and Craig Howe appeared on behalf of the Troy and Stephen Christiansen appeared on behalf of Brent. The

Court took the matter under advisement and makes its findings of fact and conclusions of law here within.

## **Background**

Brent and Troy are brothers-in-law in a close-knitted family, the Morgans – Brent married Christa Morgan ("Christa") and took the Morgan surname. The Morgans would often have family gatherings every other week and on holidays. Further, from the testimony provided to the Court, it is clear the Morgans are very involved with each other's lives.  Brent and Troy both ran separate lending businesses: Summit Development (Brent's) and Ezama (Troy's). Both Summit and Ezama were hard money lenders, meaning the loans were generally high risk with short repayment terms. Brent and Troy often conferred with one another in their lending business.  In 2009, Brent and Troy had a falling out which changed the way the family interacted. While Brent and Troy were not on speaking terms, Troy, Brent, and Christa remained close with other members of the Morgan family and frequently attended family gathers – several witnesses testified that Brent and Troy always kept a respectful distance from each other at these gatherings and at most, engaged in small talk.

This bankruptcy case began on May 18, 2010, when Troy filed for bankruptcy under Chapter 7 of the Bankruptcy Code, 11 U.S. Code §701 *et al*. Troy filed his statement of financial affairs and schedules (the "Schedules") on that same date and did not schedule Brent as a creditor. On August 16, 2010, the Chapter 7 Trustee filed a report certifying that there was no property to be distributed and that the estate had been fully administered, which rendered it a no-asset case. No objections were filed, and Troy received a discharge under 11 U.S. Code § 727 on September 1, 2010. On September 20, 2010, the Court noted the filing of the Trustee's final account and closed Troy's bankruptcy case.

2

On August 26, 2014, the Utah Department of Commerce, Division of Securities (the "Division"), initiated an Order to Show Cause in an administrative proceeding against Brent and Summit alleging violations of Utah securities laws in connection with his investment business. The events which formed the basis for the Division's action occurred in 2007. The Division eventually imposed a fine against Brent and Summit. Brent and Summit appealed the Division's decision; however, the Utah Court of Appeals upheld the Division's fine in 2018. At the evidentiary hearing in this Court, evidence was presented indicating that the Brent and Summit reached an agreement in 2019 with the Division, whereby they agreed to pay a reduced amount of $68,166.00 in order to resolve the fine. Evidence was also presented that such amount has now been paid.

On July 31, 2018, Brent filed an action against Troy in a Utah state court ("State Court Action") based on theories of indemnity and unjust enrichment resulting from the Division's fine. In the complaint, Brent alleges that the fine imposed by the Division arose because Troy's actions in June 2007. The summons and complaint were served on the Troy on August 2, 2018. Troy was twice given additional time to file a response to the complaint, which he failed to do. On September 25, 2018, Brent obtained a default judgment against Troy for $140,395.00. That amount was identical to that fine originally imposed by the Division.

Shortly after the default judgment had been entered, on September 28, 2018, Troy emailed Brent and Brent's counsel, alerting them to the fact that the underlying actions which formed the basis of Brent's State Court Action claim were discharged in Troy's 2010 bankruptcy case. *See* Brent's Exhibit M. Over the next several months; Troy continued to reiterate the point of his original email – that the underlying debt Brent sought to collect on was discharged. *See* Troy's Exhibit 12. On November 12, 2018, Troy's counsel who assisted him with his bankruptcy petition

in 2010 filed a notice of bankruptcy in the State Court Action, and on December 3, 2018, wrote a

letter to Brent's counsel once again alerting him to the fact that any obligation owing to Brent had

been discharged. *See* Troy's Exhibits 13 and 14.

On January 2, 2019, Brent filed an application for a writ of garnishment in the State Court

Action. *See* Brent's Exhibit OO. The state court conducted an ex parte hearing, without Troy's

appearance, on February 13, 2019, on Brent's application for the writ. *See Id*. The state court issued

the writ on February 14, 2019. *Id.* However, Brent did not immediately begin garnishing Troy's

wages pursuant to the writ. According to testimony by Brent, Troy, and Mark Rose ("Mark"), the

parties entered into negotiations attempting to settle this matter. *See also* Brent's Exhibit BB.

These negotiations fell through, and Brent began to garnish Troy's wages, with the first

garnishment taking place on May 2, 2019. *See* Brent's Exhibit YY.

On May 7, 2019, Troy submitted a request for an order to show cause with the state court

challenging Brent' garnishment of his wages. *See* Brent's Exhibits N and OO. Troy's argument for

challenging Brent's garnishment was that the underlying debt had been discharged in his

bankruptcy. *See* Brent's Exhibit N. Brent objected to the order to show cause on the grounds that

Troy's arguments attacked the underlying judgment which could not be challenged in garnishment

proceedings. *See* Troy's Exhibit 15. On May 15, 2019, the state court conducted a hearing on the

order to show cause and denied Troy's objection to garnishment for the reasons raised by Brent.

*See* Brent's Exhibit OO and Troy's Exhibit 15. Since that time, Troy alleges Brent has garnished

Troy's employer, The Village Cobler, around $4,700.

Subsequently, Troy filed his motion to reopen his 2010 bankruptcy case in this Court and

sought an order for contempt and sanctions against Brent for his alleged violation of the discharge

injunction on July 8, 2019. *See* Docket No. 18. Brent and his counsel attested that they stopped

garnishing Troy's wages after Troy filed his motion. In addition to objecting to Troy's motion, Brent filed an alternative motion, that if the case was reopened, then Brent had the right to assert that the state court judgment is non-dischargeable under 11 U.S. Code §523 (a).

 The Court conducted a preliminary hearing on this matter on August 29, 2019. The Court granted Troy's motion only to the extent as to reopen the case. The Court did not make any findings on the substantive aspects of either parties' arguments, entered a scheduling order setting up an evidentiary hearing to take place on November 8, 2019, and mentioned that Brent could file a motion to dismiss the bankruptcy case if he desired. Brent filed his motion to dismiss citing the same positions he took in objecting to reopening Troy's bankruptcy case. The Court heard oral argument for Brent's motion on November 6, 2019. While labeled as a motion to dismiss, Brent clarified that the motion is simply to reclose the bankruptcy case.

Brent raised several theories for reclosing Troy's bankruptcy case, and one was that of res judicata, where he argued that the matter had already been decided which barred Troy from pursuing sanctions for violation of the discharge injunction. At oral argument, the Court took the issue of res judicata under advisement – leaving the other arguments to be dealt with later at an evidentiary hearing if the Court decided that it needed one in light of the res judicata ruling.

On December 5, 2019, the Court issued a bench ruling addressing the issue of res judicata and found res judicata was not applicable in this case and rescheduled the evidentiary hearing for February 10, 2020, to address the remaining issues. At the final pretrial hearing, the Court limited the issues to only Troy's motion for sanctions, Brent's equitable defenses, and whether the Court needed to distinguish this case from *Watson v. Parker (In re Parker)*, 264 B.R. 685, 693-95 (10th Cir. BAP 2001) which discusses the dischargeability of a debt not scheduled and when a claim arises. The Court further determined that any claims seeking to revoke Troy's discharge, under 11

U.S. Code § 727, or to determine dischargeability under 11 U.S. Code § 523 would need to be addressed in an adversary proceeding and not in this main case. *See* Federal Rule of Bankruptcy Procedure 7001(4) & (6). At that pretrial hearing, Brent mentioned that he intended to file an adversary proceeding, but as of this date, no adversary proceeding has been commenced.

The Court conducted the evidentiary hearing on February 10, 2020, and heard final arguments on the remaining issues in Brent and Troy's motions on March 9, 2020. The parties' positions can be summarized as follows: First, Troy argues that Brent should be held in contempt for violation of the discharge injunction pursuant to 11 U.S. Code § 524 for initiating the State Court Action and collecting on a debt that he believes had been discharged under 11 U.S. Code § 524. Although not listed in the Schedules, Troy argues that Brent had knowledge of his bankruptcy case around the time the case was filed in 2010, i.e., that Troy recalled telling Brent at a golf outing prior to the Court granting his discharge. Further, Troy testified that he recalls informing Brent and Brent's counsel about his bankruptcy shortly after the Division commenced its administrative proceeding against Brent. Troy also presented evidence from other witnesses on the issue of whether Brent knew about the bankruptcy much earlier than 2018. Troy argues that despite Brent's knowledge that his claim arose pre-petition, he still sought to collect on this debt that had been discharged.

Brent objects to Troy's motion for contempt and sanctions on several grounds. First, Brent argues that the motion should be denied on the equitable grounds of laches and equitable estoppel. Brent argues that (1) Troy did not act diligently in raising the issue of the bankruptcy discharge in a timely manner and (2) because Troy did not raise this issue in a timely manner Brent incurred attorney fees and costs and (3) Brent adamantly denies having knowledge of Troy's bankruptcy case until after the default judgment had been entered.

Second, Brent argues that the Court, in its discretion, should deny Troy's motion on other equitable grounds. Brent cites numerous cases from around the country whereby courts denied reopening bankruptcy cases based on the length of time between the time the case was closed and the motion to reopen was filed.

Third, Brent contends that the Court should reconsider the Tenth Circuit's mechanical approach adopted in *Watson v. Parker (In re Parker)*, 264 B.R. 685, 693-95 (10th Cir. BAP 2001), aff'd, 313 F.3d 1267-, 1268-69 (10th Cir. 2002), and adopt an equitable approach to reopening this case. *In re Parker* is pivotal in this matter as it is circuit authority as to reopening a closed case where a debtor did not schedule a debt in a no-asset case. Additionally, Brent argues that the Court should reconsider *In re Parker's* adoption of the conduct test or modify the conduct test for when a claim arises. Brent's objections to Troy's motions also serve the basis for his motion to reclose the case.

Troy argues that equitable defenses – such as laches and equitable estoppel – cannot be raised as a defense for violating a bankruptcy discharge injunction. Further, Troy asserts that Brent's allegations of not knowing about his discharge are not to be believed. In support of attacking Brent's credibility, Troy points to the Findings and Conclusions from the Division hearing (Brent's Exhibit 7), which found Brent to be untruthful.

After hearing oral argument on March 9, 2020, the Court took Brent and Troy's motions under advisement.

### Jurisdiction, Venue, and Notice

The jurisdiction of this Court is properly invoked under 28 U.S.C. § 1334 and has been expressly consented to by the parties. This is a core proceeding within the meaning of 28 U.S.C. §

157(b)(2), and this Court may enter a final order. Venue is proper under the provisions of 28 U.S.C. §§ 1408. Notice of all the hearings is found to be proper in all respects.

## Legal Analysis

_Brent's Motion to Reclose Troy's Bankruptcy Case:_

The Court reopened Troy's bankruptcy case at the preliminary hearing on his motion. While the Court reopened Troy's case, it allowed Brent the option to file a motion challenging the Court's decision and to reclose the case. Brent filed his respective motion to reclose Troy's bankruptcy case; accordingly, the Court believes it is appropriate to begin its' analysis by addressing whether it was appropriate to have reopened Troy's bankruptcy case.

Section 350(b) of the Bankruptcy Code provides that a case may be reopened "to administer assets, to accord relief to the debtor, or for other cause." "[A]lthough the bankruptcy court has discretion in many instances whether to reopen a bankruptcy case, it is the duty of the court to reopen a case whenever prima facie proof is made that the estate has not been fully administered." _Riazuddin v. Schindler Elevator Corp._ (_In re Riazuddin_), 363 B.R. 177, 183-84 (10th Cir. BAP 2007). Troy did not seek to have assets administered but does seek to accord relief to him, i.e., that he has been injured by actions which he claims violate his discharge injunction. A bankruptcy court's discretion to reopen "must be tethered to the parameters of § 350(b) or it is an abuse of discretion." _In re Alpex Computer Corp._, 71 F.3d 353, 356 (10th Cir. 1995). Regardless of the reason, the decision to reopen a case is committed to the sound discretion of the bankruptcy court. _In re Petroleum Production Management, Inc._, 282 B.R. 9, 13 (10th Cir. BAP 2002).

Bankruptcy courts consider several factors in deciding whether or not to reopen a closed case, these include: (1) the length of the time that the case was closed; (2) the nature of the parties' dispute; (3) whether a non-bankruptcy forum can determine the issues submitted for consideration;

8

(4) whether any parties would be prejudiced if the case were or were not reopened; (5) the extent of the benefit to any party by reopening; and (6) whether it is evident at the outset that no relief would be forthcoming if the motion to reopen is granted. *In re Soldier Summit Rec. & Dev. Co., L.L.C.*, 2014 WL 98701 (Bankr. D. Utah 2014); *see also In re Atari, Inc.*, 2016 WL 1618346 (S.D.N.Y Bankr. 2016).

Brent has asserted the doctrines of laches, equitable estoppel, and the Court's discretionary power to deny reopening bankruptcy cases or as in this case, grounds for denying Troy's requested relief and reclosing the case. These equitable doctrines raised by Brent, mostly go towards the length of time factor. Brent argues that Troy failed to act diligently because Troy did not raise his bankruptcy as a defense in the State Court Action, or beforehand. Additionally, according to Brent, eight years passed in which Troy did not advise Brent of his bankruptcy. During that time, Brent was forced to defend himself in the Division's administrative proceeding in which Troy's actions were allegedly implicated. Thereafter, when Brent turned to Troy for relief, Troy sat on his hands for another full year, from July 2018- July 2019, before raising the claim in this Court. Accordingly, the Court will address each of these equitable doctrines in turn.

The Court notes in some of the sections of this Memorandum Decision, there are references to "the debt" or "Troy's debt to Brent."  This is not a finding that there was a debt, but only a general reference to a possible debt that Troy owed to Brent based on the allegations in the State Court Action.

(1) <u>Laches:</u>

A motion to reopen a case brought pursuant to Bankruptcy Rule 9024, is not subject to the one-year limitation that governs other motions. "However, bankruptcy courts have found that when an unreasonable delay has prejudiced the party opposing reopening, laches is a valid reason to

deny motions to reopen." *Watson v. Parker (In re Parker)*, 264 B.R. 685, 692 (10th Cir. BAP 2001).
"Generally, courts will apply the doctrine of laches when the following two elements are met: '(1)
lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party
asserting the defense.'" *Id.* (*quoting Costello v. United States*, 365 U.S. 265, 282 (1961)).

Here, the Court does not believe that the elements for laches have been satisfied. As to
diligence, it is undisputed that Troy did not assert his bankruptcy discharge as a defense in the
State Court Action prior to the entry of a default judgment, but Troy immediately thereafter
brought the bankruptcy discharge to Brent and Brent's counsel's attention by way of email and
informed them that the underlying debt had been discharged. *See* Brent's Exhibit M. Troy testified
that during the time period prior to a default judgment being entered, he had raised the issue
informally with Brent and Brent's counsel; however, the Court will not adopt this argument without
additional corroboration. However, Troy continued to advise Brent that Troy's discharge
prevented Brent from collecting on this debt prior to the time that Brent applied for a writ of
garnishment. *See* Brent's Exhibit M & Troy's Exhibits 10, 12, 13, and 14. The state court granted
Brent's application for a writ of garnishment on February 13, 2019, and shortly thereafter, Brent
and Troy entered into settlement negotiations. *See* Brent's Exhibit BB and Mark's Testimony.
Once it became clear these negotiations were futile, Brent began to garnish Troy's wages with the
first garnishment taking place on May 2, 2019. *See* Brent's Exhibit YY. Almost immediately
following this garnishment, Troy filed for an order to show cause in the state court challenging the
validity of the underlying garnishment. The state court conducted a hearing on May 15, 2019, and
overruled Troy's objection. *See* Brent's Exhibit OO & Troy's Exhibit 16. On July 08, 2019, Troy
filed his motion to reopen with this Court. *See* Docket No. 18.

While Troy raised the possibility of filing his motion to reopen and to seek sanctions numerous times throughout this whole process, the record clearly shows that rather than immediately coming to this Court, he chose to resolve the matter either by having Brent dismiss the State Court Action, reaching a form of a settlement agreement or by defeating the garnishment at the state court level. Even though Troy could have filed this motion in this Court sooner, the Court finds that he was diligent enough to raise these issues to Brent and his counsel. Trying to resolve a matter rather than immediately coming to the Court for relief is something in which the Court not only appreciates but encourages. Only after all of these options failed did Troy promptly seek relief from this Court; it took almost a month and a half after the state court denied his objection to garnishment for Troy to file his motion. Accordingly, the Court finds that there was no lack of diligence on Troy's part for filing the motion to reopen.

As to the prejudice suffered, Brent argues that he has had to incur legal costs associated by Troy not raising this issue earlier. The Court will address this point in more detail later, but any prejudice suffered by Brent was self-inflicted by pursuing a debt which he and his counsel had been notified was discharged in Troy's bankruptcy. As discussed hereafter, Brent knowingly violated the discharge injunction and to argue that he suffered prejudice as a result of this willful violation is unpersuasive to this Court. Accordingly, the Court concludes the elements of laches have not been satisfied.

*(2) Equitable Estoppel:*

In addition to laches, *Parker* recognized that a motion to reopen might also be barred by the doctrine of equitable estoppel. *See In re Parker*, 264 B.R. at 692.

> Courts employ equitable estoppel when all four prongs of the following test are met: 1) the party to be estopped is aware of the facts; 2) the party to be estopped intended its act or omission to be acted upon; 3) the party asserting estoppel did not have knowledge of the facts; and 4) the party asserting

estoppel reasonably relied on the conduct of the other party to his or her substantial injury.

*Id.* Accordingly, the Court will analyze these elements.

The Court believes two elements are problematic for Brent. First, there is no question that Troy never filed a response in the State Court Action; thus, allowing default judgment to be entered. However, Brent presented no evidence which suggested Troy intended his omission to file an answer to be acted upon by Brent. In fact, immediately following the entry of default judgment, Troy explicitly informed Brent and his counsel that the debt they sought to collect on was discharged and went as far as providing the legal authority supporting Troy's position. *See* Troy's Exhibits 10, 12, 13, and 14. Despite Troy directly informing Brent about the debt being discharged, Brent went forward with garnishment proceedings. Accordingly, the Court finds that this element has not been satisfied.

The second element which poses a problem goes towards Brent's knowledge of Troy's bankruptcy. The Court will go into more detail on this further on in this opinion; however, the weight of the evidence clearly shows that Brent had knowledge of Troy's bankruptcy case long before filing the State Court Action. Even if Brent had no knowledge as of the time he obtained a default judgment, he undeniably had knowledge long before commencing garnishment proceedings that the debt he sought to collect upon had been discharged; thus, his element has not been satisfied. Accordingly, the Court determines that the elements of equitable estoppel have not been satisfied.

*(3) Court's Discretion to Deny Reopening a Case:*

Brent's next reason for closing Troy's bankruptcy case relates to courts using their discretion to deny reopening cases when a significant amount of time has passed. "The longer the time between the closing of the estate and the motion to reopen, the more compelling the reason for

reopening the estate should be." *In re Soldier Summit Rec. & Dev. Co., L.L.C.*, 2014 WL 98701 (Utah Bankr. 2014).

Here, it has been nearly a decade since Troy's bankruptcy case had been closed; however, the underlying actions which are the basis for Troy's motion began to occur in June 2018 – approximately a year prior to the filing of Troy's motion. Further, the basis of Troy's motion, a violation of the discharge injunction, is a compelling reason for reopening the matter in the Court's opinion. Even though Troy waited almost a year prior to filing his motion to reopen, the Court finds that Troy diligently tried to resolve the matter without getting to the point where he had to reopen his case and seek sanctions against his brother-in-law. Accordingly, the Court concludes the length of time factor has no adverse impact on its decision to reopen Troy's bankruptcy case.

*(4) Equitable Approach vs. Mechanical Approach:*

In *Watson v. Parker  (In re Parker)*, 264 B.R. 685, 696 (10th Cir. BAP 2001), the Bankruptcy Appellate Panel for the Tenth Circuit (which was later affirmed by the Tenth Circuit Court of Appeals *Watson v. Parker (In re Parker)*, 313 F.3d 1267 (10th Cir. 2002)) determined that an obligation not scheduled was discharged where the case was a no-asset case, and there were  no grounds for asserting a non-dischargeable claim and no bar date for filing claims had been set. In doing so, the Tenth Circuit adopted what has come to be referred to as a "mechanical" approach to reopening bankruptcy cases.

Brent believes that the Court should reconsider three different aspects of *In re Parker*. Only one of such goes towards the reopening of a bankruptcy case. Brent argues the Court should adopt the "equitable" approach over the "mechanical" approach. Courts using the "equitable" approach decide whether to reopen a case under section 350(b) by examining the circumstances surrounding the failure to list a certain creditor. Generally, these courts have found that motions to reopen

13

should be granted unless the omission was the result of fraud or the omission was intentional. These courts often conclude that reopening a case will have an impact on the dischargeability of the debt. Thus, the intent of the debtor at the time of the omission is relevant to the inquiry. *Stark v. St. Mary's Hospital (In re Stark)*, 7171 F.2d. 322 (7th Cir. 1983); *see also Faden v. Ins. Co. of North America (In re Faden)*, 96 F.3d 797 (5th Cir. 1996)l; *Samuel v. Baitcher (In re Baitcher)*, 781 F.2d 1529, 1534 (11th Cir. 1986).

The other approach used by courts is known as the "mechanical" approach. Under the "mechanical" approach, pursuant to the plain language of the Bankruptcy Code the debtor is discharged by operation of law and that to reopen a bankruptcy case to schedule a previously unlisted debt in a no asset, no bar date case has no effect on the dischargeability of the debt. *Zinhelt v. Madaj (In re Madaj)*, 149 F.3d 467, 471 (6th Cir. 1998); *see also Judd v. Wolfle (In re Judd)*, 78 F.3d. 110, 115 (3d Cir. 1996); *Beezley v. California Land Title Co. (In re Beezley),* 994 F.2d 1433 (9th Cir. 1993).

In *In re Parker*, 264 B.R. 685, 696 (10th Cir. BAP 2001), the Bankruptcy Appellate Panel faced the question of whether to adopt the "equitable" approach or the "mechanical" approach. That Court found that the "mechanical approach is better reasoned and more faithful to the language of the Bankruptcy Code; thus, it adopted the "mechanical" approach over the "equitable" approach. Since *In re Parker* explicitly rejected the "equitable" approach and is still binding authority, any argument seeking to adopt this approach would be better made to an appellate court.

This whole argument revolves around whether Troy owed Brent a pre-petition debt. Troy testified that he did not schedule Brent because Troy didn't believe he owed Brent anything. Further, any obligation that could have arisen, arose in 2007 which was the operable year that the Division looked at in assessing Brent for his conduct.  Without delving into whether there was a

debt owing to Brent relating to the Division's action, it is clear to this Court that the debt would have been a pre-petition obligation and that there was a plausible reason for not scheduling it. Accordingly, the Court determines Brent's argument for adopting the equitable approach to be unpersuasive.

*(5) Totality of Factors:*

In addition to the length of time factor not weighing against reopening Troy's bankruptcy case, the Court believes that the weight of the other factors courts considered when deciding whether to reopen the case – particularly the factors going towards the nature of the dispute, forum and relief being sought - overwhelmingly favor reopening the case. The Court believes that it appropriately used its discretion to reopen the case here. Accordingly, the Court will deny Brent's motion to reclose Troy's bankruptcy case.

*Discharge:*

The Court will now determine whether the underlying debt had been discharged. In consumer cases, bankruptcy law serves at least two basic purposes: (1) to solve a collective action problem among creditors in dealing with an insolvent debtor, and (2) to provide a "fresh start" to individual debtors overburdened by debt. The second bankruptcy policy of providing a "fresh start" is carried out by way of a discharge of the debtors' debts in bankruptcy. Debts that can be discharged are treated in Chapter 7, Chapter 13, and even Chapter 11 cases under the Bankruptcy Code.

In a Chapter 7 bankruptcy case, such as this one, 11 U.S. Code §727(b) discharges a debtor "from all debts that arose before the date of the order for relief" except as provided in 11 U.S. Code § 523. Here, Brent has raised some concerns that the debt in question falls into several categories listed in § 523(a) in his papers. At a previous hearing in December 2019, the Court

directed the parties to Federal Rules of Bankruptcy Procedure Rule 7001 and reminded the parties that a separate adversary proceeding would need to be brought to determine the non-dischargeability of the underlying debt. Except as discussed and ruled on below, the Court makes no finding as to the dischargeability of debts hereunder § 523(a). Further, no separate adversary proceeding has been filed as of this time.

11 U.S. Code §524 applies to any "debt discharged under section 727" and operates as an injunction against the commencement or continuation of an action or an act to collect, recover or offset ant personal liability of a debtor. Section 524(a) "prevents any act intended to cause a debtor to repay a discharged debt, including legal proceedings, letters, phone calls, threats of criminal proceedings, or similar actions." Section 524 works "to prevent a debtor from being pursued for the payment of discharged debts, precluding virtually all actions by a creditor to collect personally from the debtor." In the Tenth Circuit, a claim arises at the time of the debtor's conduct that gives rise to the claim. *Watson v. Parker (In re Parker)*, 264 B.R. 685, 693-95 (10ᵗʰ Cir. BAP 2001). Here, Brent's allegations that give rise to his claim occurred well before the petition date (i.e., 2007), meaning it is a pre-petition debt that was discharged by operation of law pursuant to §727.

As previously stated, Brent seeks to challenge *In re Parker* in three aspects. The Court already addressed one of those arguments, and the final two aspects Brent challenges would ultimately have an impact on whether Troy's debt had, in fact, been discharged. First, Brent believes the Court should adopt the accrual theory, whereby a claim arises only when there is an accrued cause of action under state law. *In re M. Frenville Co., Inc,* 744 F.2d 332 (3d. Cir. 1984). Under this theory, Brent argues that the claim would have arisen post-petition at the time the Division's proceeding concluded. In *In re Parker*, the Tenth Circuit Bankruptcy Appellate Panel had to choose between the accrual theory and the conduct theory – where a claim arises at the time

16

of the debtor's conduct that gives rise to the claim – and adopted the conduct theory over the accrual theory. The Tenth Circuit Court of Appeals later affirmed the Tenth Circuit Bankruptcy Appellate Panel and explicitly adopted the conduct theory. Here, the conduct that allegedly gives rise to Brent's claim occurred pre-petition; thus, the claim arose pre-petition. In the Tenth Circuit, the law looks at when the obligation could have first arisen, not when it was sought to be enforced. With *In re Parker* being binding authority (i.e., The Circuit adopted the conduct theory when it affirmed the BAP) with this Court, any argument for adopting the accrual theory is better suited for an appellate court to handle. Accordingly, the Court declines to apply the accrual theory in determining when a claim arises.

The final argument Brent asserts for reconsidering *In re Parker* relates to a third test, known as the "middle ground" theory or "narrow conduct test," as an alternative test. Under this approach, courts have found that a claim arises at the time of the conduct upon which the debtor's liability is based only if the claimant had a specific relationship with the debtor at the time the conduct occurred. *In re Piper Aircraft corp.*, 162 B.R. 619 (Bankr. S.D. Fla 1994); *see also California Dep't of Health Servs. V. Jensen (In re Jensen)*, 995 F.2d 925, 930-31 (9th Cir. 1993). The Tenth Circuit Bankruptcy Appellate Panel in *In re Parker* acknowledges that some form of this test existed but never addressed whether or not to apply this test. *Watson v. Parker (In re Parker)*, 264 B.R. 685, n. 12 (10th Cir. BAP 2001). However, in the Ten Circuit Court of Appeals' opinion, that Court outright adopted the conduct theory and did not mention adopting any form of a hybrid "narrow conduct test." Brent argues that the Court should apply this test because evidence existed that would permit the Troy to identify Brent during the course of the bankruptcy proceedings and permit notice to him during the pendency of the proceedings. Further, Brent argues he would be deprived of due process if the Court did not adopt this approach.

*In re Parker* makes clear that our circuit follows the conduct theory, and nothing suggests that any form of the "middle ground" theory or "narrow conduct test" exists in the Tenth Circuit. Brent does not provide any authority, other than a footnote in the Tenth Circuit Bankruptcy Appellate Panel's decision simply acknowledging that some form of this test existed, that courts in this circuit have applied this test. Since the Tenth Circuit Bankruptcy Appellate Panel and the Ten Circuit Court of Appeals in *In re Parker* outright adopted the conduct approach and there is no authority narrowing the scope of that approach in the Tenth Circuit, the Court sees no basis to apply a hybrid conduct test here. Accordingly, the Court elects not to adopt any form of a hybrid conduct test.  Again, this argument may be more appropriate for an appellate court.

For these reasons, the Court finds and concludes that the debt that Brent seeks to collect had been discharged in 2010 by operation of law under *In re Parker*. With that being said, the Court makes no findings or determinations if the debt could be non-dischargeable under § 523(a). If Brent wishes to have the Court make a determination as to the underlying debt being non-dischargeable, then that must only be done through an adversary proceeding.

<u>*Sanctions and Contempt:*</u>

A violation of § 524 does not create a cause of action for damages itself; however, violations may be treated as civil contempt. "Under §105(a), bankruptcy courts have the equitable power to enforce and remedy violations of substantive provisions of the Bankruptcy Code, including in particular the discharge injunction in Section 524(a)(2)." *In re Paul*, 534 F.3d 1303, 1306 (10th Cir. 2008). Courts have generally awarded actual damages, attorneys fees, and punitive damages as a sanction where a willful violation of the discharge injunction occurs. *In re Slater*, 573 B.R. 247, 256-57 (Bankr. D. Utah 2017). Further, a creditor's good faith is not relevant when deciding whether there was a violation of § 524 (a)(2). *Id.* Civil contempt may be appropriate if

there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful. *Taggart v. Lorenzen*, 139 S. Ct. 1795, 180, 204 L.Ed. 2d 129 (2019).

"To hold a party in contempt under Section 105, the burden is on the movant to show by clear and convincing evidence that the creditor (1) had actual or constructive knowledge of the discharged debt and (2) intended the actions which were taken in the violation of the injunction." *In re Slater*, 573 B.R. 247, 256 (Bankr. D. Utah 2017); *see also Peyrano v. Sotelo (In re Peyrano)*, 558 B.R. 451, 457 (Bankr. E.D. Okla. 2016). Clear and convincing evidence involves a greater degree of persuasion than that which will satisfy a preponderance of the evidence standard, albeit a lesser standard than beyond a reasonable doubt. Clear and convincing evidence is evidence that creates in the fact finder's mind an abiding conviction that the truth of a factual contention is highly probable. *Colorado v. New Mexico*, 467 U.S. 310, 316, 81 L. Ed. 2d 247, 104 S. Ct. 2433 (1984). If the evidence requires the fact finder to draw extensive inferences, the evidence does not satisfy the clear and convincing proof requirement. *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed. Cir. 1991). Accordingly, the Court will address whether Troy has met his burden in showing that Brent had either actual or implied knowledge of the discharged debt and whether the Brent intended the actions which were taken in violation of the injunction.

*(1). Knowledge of the Discharge Debt:*

The question presented here is not if Brent had knowledge of the discharged debt, but rather, when did he have knowledge of it. To satisfy the knowledge requirement, Troy needs to show that Brent either had actual or constructive knowledge of the discharged debt. "[T]o have 'actual knowledge' of a piece of information, one must in fact be aware of it.'" *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020). "The law will sometimes impute

knowledge—often called 'constructive' knowledge—to a person who fails to learn something that a reasonably diligent person would have learned." *Id*.

The Court believes that knowledge and/or notice by Brent of Troy's bankruptcy can best be divided up into two general time periods. The first period analyzed will be that as of September and December 2018. Here, an email sent by Troy to Brent and his counsel establishes on September 28, 2018, that the Creditor had actual knowledge of the bankruptcy and the possibility of the discharged debt– several days after the default judgment had been entered. *See* Creditor's Exhibit M. The Court uses the term "possibility" here because the email only alleges that the debt was discharged by Troy. While it may be inferred that Brent's counsel was aware of the holding in the *Watson v. Parker (In re Parker)*, 264 B.R. 685 (10th BAP 2001), and the implications that case has on Brent's judgment, Brent's counsel's response suggests he may not have been aware of the case law. *See* Troy's Exhibit 10. However, Brent and his counsel were undisputedly put on notice of the dischargeability of the debt on December 3, 2018, when Brent's former counsel sent a letter to both of them outlining that Brent's claim had been discharged pursuant to *In re Parker*. *See* Troy's Exhibit 14. Based on the above analysis, the Court finds that the Brent, and his counsel, had actual knowledge of the bankruptcy on September 28, 2018, and were aware of the debt being discharged not later than December 3, 2018. Accordingly, Brent had actual knowledge of Troy's bankruptcy after the default judgment had been entered in the State Court Action, but prior to commencing garnishment proceedings.

The second time period the Court will analyze goes back to 2010 and the years following Troy's commencement of his bankruptcy case. Troy testified that on several occasions, he explicitly "looked him [Brent] right in the eye" and informed him about the bankruptcy. One such occasion occurred the week of August 16, 2010, at a golf outing whereby Troy alleges that he

specifically informed Brent of the pending bankruptcy. Another instance occurred shortly after Brent was served by the Division with regards to the administrative action in 2014.   There were no other third-party witnesses to testify to the accuracy of Troy's testimony or other evidence supporting his testimony. Given Troy and Brent were on non-speaking terms at this time at these points in time, that there is no additional evidence supporting Troy's testimony, and considering his recollection as to these events being murky, at best, the Court finds that Troy's testimony alone has not satisfied the "clear and convincing evidence" standard in proving that the Brent had actual knowledge of Troy's bankruptcy prior to September 28, 2018.

While the Court finds that Brent's actual knowledge about Troy's bankruptcy occurred on September 28, 2018, the testimony provided by Jody Morgan ("Jody"), Natalie Dkyes ("Natalie"), and Robert Morgan ("Robert") clearly demonstrate that Troy did not attempt to make his bankruptcy a secret from his family. To reiterate an important point, the Morgan family was at one time a closely-knit family and would have large family get-togethers two or three times a month. Troy and Brent attended these family get-togethers even after their relationship changed in 2009 – testimony suggests that they actively avoided each other and only occasionally engaged in small talk. The fact that both parties were still present at these get-togethers shows that, despite the rough relationship between them, neither party became estranged from the Morgan family around 2010.

Natalie (Troy's sister) and Jody (Troy's mother) testified that they were made aware of Troy's bankruptcy sometime during 2010 because they both had interests which concerned the bankruptcy, and further, their testimony showed that Brent's wife, Christa (also Troy's sister), was aware of Troy's bankruptcy filing. Troy and Brent both jointly owed Natalie money. Natalie testified that Troy never paid her back and that Brent had returned the portion of the amount he owed to her. Natalie further testified that on a phone call with Christa, that Christa promised to

pay back Natalie, but Christa said Troy was not going to pay her back because "he took the easy way out."

 Jody testified that on a telephone call that Christa had informed Jody that Troy's recent bankruptcy filing should concern Jody and Robert Morgan (Jody's husband) personally. Jody recalls this conversation with Christa because Troy was a signatory on Jody and Robert's business account, and Troy was also on Jody's personal banking account as well. Subsequent to this conversation with Christa, Jody testified that she took the Troy off of these accounts. The Court finds Natalie's and Jody's testimony to be credible.

Even Christa's testimony shows that there was some sort of inclination that she was aware of Troy's bankruptcy. Christa testified that she and Brent loaned Troy approximately $45,000 in 2009. When Christa texted Troy, a few days after initially loaning Troy money, about the repayment of the loan, Christa testified that Troy replied that he was not repaying the debt. Christa and Brent did not testify as to other remedies they pursued in trying to get this money back, and no evidence has been admitted showing alternative legal proceedings or collection actions; rather, it appears that Christa and Brent operated under the assumption that they could never collect this loan – implying that they knew the debt had been discharged. When the Court takes into account the fact that Brent is willing to litigate the motions currently before the Court, it is highly unlikely that the Christa and Brent would walk away from a loan of the magnitude of $45,000 unless they were sure they could not recover from it. This lack of collection efforts as to the $45,000 loan, combined with Jody and Natalie's testimony, strongly suggests that at least Christa was aware that Troy filed for bankruptcy.

Additionally, Robert (Troy and Christa's father) testified that he was also made aware of Troy's bankruptcy about the time when the petition was filed. Robert's testimony took it a step

further by suggesting that Brent himself was even aware of Troy's bankruptcy. Shortly after Brent

filed the State Court Action in 2018, Robert recalled calling Brent to find out his side of the story.

The conversation went back to the topic of the Division's administrative action, and Robert asked

Brent why the Division did not go after Troy. Robert testified that Brent's responded by saying,

"Troy was a chicken and that he took the easy way out," referring to Troy's bankruptcy. The Court

finds Robert's testimony credible.

Robert further testified that he found out about the State Court Action because "they're

both family, word gets around." Excluding Troy's testimony, when the Court considers the

closeness of this family, how different family members were affected as a result of the bankruptcy,

the fact that Troy did not hide his bankruptcy, and the open question as to why Brent and Christa

did not appear to pursue collection actions as to the purported prepetition loan all persuades the

Court to find that Brent had constructive knowledge of Troy's bankruptcy sometime around 2010.

While Troy did not satisfy his burden in proving Brent had actual knowledge of the bankruptcy at,

or around, of the petition date, the Court finds that there has been sufficient credible testimony

from others to find that Brent had constructive knowledge of Troy's bankruptcy around 2010 –

well before commencing the State Court Action and acquiring the default judgment.  Accordingly,

the Court finds that the knowledge requirement has been met.  The Court finds Brent's testimony

that he did not know of the bankruptcy before September 28, 2018, to be not credible.

*2). Brent's Intent as to his Actions Which were Taken in the Violation of the Injunction:*

Brent made two arguments as to why his actions did not violate the discharge injunctions.

First, Brent argues that he was unaware of Troy's 2010 bankruptcy discharge. For reasons

previously articulated, the Court finds that Brent, at minimum, had constructive knowledge of

Troy's bankruptcy long before he filed the State Court Action and actual knowledge at a minimum as of September 28, 2018, well before garnishing Troy's wages.

Brent's second argument requires a more in-depth analysis. Brent argues that he acted in good faith and in accordance with the state court's garnishment order for proceeding to collect on the debt. As stated in *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1799 (2019), the bankruptcy code allows a court to hold a creditor in civil contempt for violating the discharge injunction of § 524 if there is no "fair ground of doubt as to whether the order barred the creditor's conduct." So, a bankruptcy court may appropriately find a creditor in civil contempt under § 105(a) when a "creditor violates a discharge order based on an objectively unreasonable understanding of the discharge order or the statutes that govern its scope." *Taggart*, 139 S.Ct. at 1802.

 Here, Brent filed the State Court Action on July 31, 2018, roughly eight years after the Troy received his discharge. On September 25, 2018, Brent obtained a default judgment against Troy. Later, on January 2, 2019, Brent filed an application for a writ of garnishment at state court. On February 13, the state court conducting regarding the writ of garnishment. *See* Brent's Exhibit OO; *see also* Troy's Exhibit 15. According to Brent's counsel, this hearing was conducted ex parte without Troy being present.  Inadequate evidence was submitted as to what exactly was discussed at the hearing for this Court to make any findings. After that hearing, the state court issued a writ of garnishment against Troy on February 14, 2019. Brent began to garnish Troy's wages beginning in April 2019, and Troy's employer made the first payment on May 2, 2019. *See* Brent's Exhibit YY and Troy's Exhibit 15.

After the first garnishment occurred, Troy filed for an order to show cause challenging the writ of garnishment with the state court on May 6, 2019. *See* Brent's Exhibits OO and N. In Troy's challenge to Brent's garnishment, Troy referred to the discharge order, and Brent's garnishment

would be in violation of the discharge injunction. Brent filed an opposition to Troy's request for the order to show cause, and the state court conducted a hearing on May 15, 2019. *See* Brent's Exhibit OO. The state court overruled Troy's objection because, in that court's view, he challenged or was attempting to litigate the underlying judgment in garnishment proceedings, which was procedurally deficient. *See* Troy's Exhibit 15 and 16. Troy's employer continued honoring the writ of garnishment from May to July 2018. On July 8, 2018, Troy filed a motion with this Court to reopen his bankruptcy case to seek an order holding Brent in contempt and impose sanctions for violation of discharge. Brent argues that under *Taggart*, there was doubt as to whether the discharge order barred his collection efforts because the state court approved the writ of garnishment and overruled Troy's subsequent objection, thereby giving it a "quasi blessing of appropriateness." The Court is unpersuaded by Brent's argument.

As with all statutory construction issues, the Court starts with the language of § 524(a)(1) which clearly and unambiguous states that a discharge "voids any judgment at any time obtained, to the extent that such judgment is a determination of personal liability of the debtor with respect to any discharged debt." A state court judgment based on discharged debt is a "void legal nullity." *In re Gray*, 573 B.R. 868, 879 (Bankr. D. Kan. 2017); *see also In re Slater*, 573 B.R. 247, 256-57 (Bankr. D. Utah 2017) (finding that when a state court judgment was partially based on discharged debt and creditors were aware of debtor's prior bankruptcy, the entire judgment was void). "Section 524(a) is meant to operate automatically, with no need for the debtor to assert the discharge to render the judgment void. A bankruptcy court can find that a post-petition state court judgment is void despite the full faith and credit normally given to state court judgments." *In re Gray* at 877. The concept of a judgment being void because of the discharge is akin to the same

holding where a judgment is obtained in violation of the stay. *See Ellis v. Consolidated Diesel Elec. Corp.*, 894 F.2d 371, 372 (10th Cir. 1990).

Here, when the state court entered a default judgment based on Brent's asserted claim that had been subject to discharge in Troy's 2010 bankruptcy, that judgment, by operation of law, became null and void. Further, the overruling of Troy's objection to the writ of garnishment in May of 2019 by the state court is not something that can trump the effectiveness of this Court's discharge order. Earlier in this decision, the Court found that Brent had constructive knowledge long before the State Court Action had been filed; thus, to argue reliance on a state court order – which almost certainly lacked a presentation of all operative facts – is not persuasive. Even if the Court adopted Brent's position of not knowing about Troy's bankruptcy until after default judgment had been entered, Brent had actual knowledge of the debt being discharged no later than December 3, 2018, well before he began the process of collecting on the judgment through garnishment. Even though Brent was aware that the underlying debt had been discharged, he continued pursuing collection actions by way of a writ. "A garnishment to collect a pre-petition debt directly violates the discharge injunction." *Fields v. Wade (In re Fields)*, 2018 WL 8223420, * 7 (Bankr. N.D. Ind. 2018); *see also Summers v. Anderson (In re Summers)*, 213 B.R. 825, 829 (Bankr. N.D. Ohio 1996); *In re Marletter*, 236 B.R. 281, 284 (Bankr. M.D. Fla. 1999).

Despite being fully aware of the underlying debt being discharged, Troy's former attorney explicitly refers to the case, *In re Parker*, identifying the type of debt was discharged, *see* Troy's Exhibit 14. Brent commenced garnishment proceedings; thereby, violating the discharge injunction. To put it simply, Brent and his counsel had sufficient notice that they could not collect this prepetition debt from Troy without violating the discharge injunction, yet they pressed forward anyway. Reliance on a state court ruling, which may not have had the full operative facts, after

Brent became fully aware of the debt being discharge is not persuasive. In the Court's view, there is no "fair ground[s] of doubt as to whether the order barred the creditor's conduct." Accordingly, the Court finds and concludes that the second element of intent has been satisfied.

_Equitable Defenses for Violating the Discharge Injunction:_

Brent asserts several equitable defenses such as laches, equitable estoppel, and the Court's discretion for reopening a case to pursue a claim for contempt and sanctions in his opposition to Troy's motion. In _In re Printer v. Cofco Creditor Co., LLC_, 323 B.R. 802 (10th Cir. BAP 2005), that Court faced a similar fact pattern. There, the creditor also asserted a pre-petition debt. The Chapter 7 debtors did not list the creditor in their bankruptcy schedules, and as a result, the creditor did not receive notice of the bankruptcy. The Chapter 7 case was closed as being a no-asset case. Four years after discharge, without knowledge of the bankruptcy, the creditor sued the debtors in state court. The debtors did not answer the complaint, and the creditor obtained a default judgment. After the default judgment was served on the debtors, the debtors informed the creditor of their bankruptcy. In spite of this information, the creditor garnished the debtor's wages. After the debtors' attempted to get the Creditor to cease collection and recognize the discharge, the debtors moved to have their bankruptcy case reopened. The creditor objected, arguing that equitable defenses, such as laches and equitable estoppel, were applicable. The bankruptcy court denied the debtor's motion. On appeal, the Tenth Circuit Bankruptcy Appellate Panel reversed the bankruptcy court and found that "[e]quitable doctrines do not impact the effect of the discharge under §524(a)." The Court is persuaded by the reasoning of this decision.

While not binding on this Court, _Lone Star Sec. & Video, Inc. v. Gurrola (In re Gurrola)_, 328 B.R. 158 (9th Cir. BAP 2005) provides further guidance on this issue. §524(a)(2), uses the phrase "whether or not discharged of such debt is waived," in determining whether a debt has been

27

discharged. The Ninth Circuit Bankruptcy Appellate Panel determined that phrase in §524(a)(2) "encompassed all theories for collecting a discharged debt as a personal liability of the debtor." *In re Gurrola* at 172.  That Court continued: "[e]stoppel theories are equitable theories typically based on conduct. The usual argument is that the person to be estopped has done or omitted to do, something that makes it inappropriate for them to rely on a right that otherwise is available. This, in functional sense, is merely one variety of waiver." *Id.*  Thus, "uses of estoppel are varieties of waiver theories that are outlawed by the phrase 'whether or not discharge of such debt is waived' in § 524(a)." *Id.*

As the Courts in *Printer* and *Gurrola* make clear, equitable arguments are not appropriate defenses against bankruptcy discharges. As a result, Brent's equitable defenses of laches, equitable estoppel, and waiver cannot be raised as defenses for violating the discharge injunction.

Accordingly, Troy has satisfied his burden for seeking sanctions against Brent for violating the discharge injunction, and the Court will grant Troy's motion for sanctions.

*Damages and Relief:*

As previously stated, a state court judgment based on discharged debt is a "void legal nullity." *In re Gray*, 573 B.R. 868, 879 (Bankr. D. Kan. 2017); *see also In re Slater*, 573 B.R. 247, 256-57 (Bankr. D. Utah 2017). Therefore, Brent's default judgment is void by operation of law.

"Courts have generally awarded actual damages, attorney fees, and punitive damages as a sanction where a willful violation of the discharge injunction occurs." *In re Slater*, 573 B.R. at 256. Troy is not seeking punitive damages, so the Court will not award any. However, Troy does seek to recoup the wages that have been garnished, and the Court will grant that relief.  The Court heard evidence that the total amount garnished from Troy's wages was $4,700; however, other testimony threw some degree of doubt as to the total amount that had been garnished from Troy.

With only one garnished check being entered into evidence, *see* Brent's Exhibit YY, the Court cannot make an accurate finding as to the total amount garnished from Troy. Accordingly, if there is any other amount that was garnished, apart from the first garnishment on May 2, 2019, that evidence should be presented at the hearing on attorney's fees addressed below.

In addition, Troy seeks an award of attorney's fees. In this case, it is clear that Troy has had to incur attorney's fees in order to enforce the discharge injunction. Accordingly, the Court will grant Troy's request for attorney's fees. Troy's counsel shall have fourteen (14) days from the day the order accompanying this memorandum is entered to file an application for attorney's fees and notice it out for a hearing. Once the application for attorney's fees has been filed, Brent has fourteen (14) days to respond. If Brent does not file a response, then the Court reserves the right to enter an order without conducting a hearing.

### Conclusion

For the reasons previously articulated, the Court denies Brent's motion to reclose Troy's bankruptcy case. Further, the Court concludes that Troy satisfied his burden in seeking sanctions and holding Brent in contempt; therefore, the Court will grant Troy's motion for an order of contempt and an award of sanctions against Brent. The Court will grant an award for actual damages, with the total amount being determined at a subsequent hearing, and grants Troy's request for an award of attorney fees. Troy's counsel shall file an application for attorney's fees and the amounts related to garnishments as previously prescribed for a determination as to the exact amount claimed within fourteen (14) days of the date of the Decision. A separate order will be entered contemporaneously with this Memorandum Decision.

## DESIGNATION OF PARTIES TO RECEIVE SERVICE

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below:

By CM/ECF to

Craig H. Howe- chowe@aklawfirm.com
Blake D. Miller - bmiller@aklawfirm.com
Stephen K. Christiansen - steve@skclawfirm.com

By U.S. Mail to: